UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Danielle Shorter,
*Individually and as the Administrator
Of the Estate of Annette Shorter*,

Case No. 3:22-cv-357

          Plaintiff,

    v.

MEMORANDUM OPINION
AND ORDER

Trilogy Healthcare of Allen, II, LLC,

          Defendant.

## I. INTRODUCTION AND BACKGROUND

In 2014,[1] Decedent Annette Shorter was admitted to a Lima, Ohio nursing home owned by Defendant Trilogy Healthcare of Allen, II, LLC, and known as Springview Manor. (Doc. No. 1 at 2). Annette received rehabilitation and nursing home services at Springview Manor from the time of her admission until September 2020. (*Id.*). Annette died on September 28, 2020, allegedly due, at least in part, to pressure ulcers and other injuries she suffered as a result of Trilogy's failure to properly care for her. (*Id.*).

Following Annette's death, an estate was opened in the Allen County, Ohio Probate Court. Annette's daughter, Danielle, was appointed as the administrator of her estate, and subsequently initiated this lawsuit on behalf of the estate and herself. Plaintiff asserts claims for negligence, wrongful death, loss of consortium, and punitive damages. (*Id.* at 2-3).

---

[1] The Complaint alleges Annette moved into Springview Manor in 2012. (Doc. No. 1 at 2). Defendant represents Annette became a resident in March 2014, not in 2012. (Doc. No. 7-1 at 2). Plaintiff appears to concede March 2014 is the correct date. (*See* Doc. No. 9 at 2).

At the time Annette was admitted to Springview Manor, Plaintiff signed an arbitration agreement (the "Agreement"). (Doc. No. 7-1 at 5-6). The Agreement states, among other things, that claims "arising out of . . . any service, diagnosis, or care" provided by Springview Manor staff to Annette, including negligence, malpractice, "or any other claim based on any departure from accepted standards of medical, nursing, health care[,] or safety," shall be subject to binding arbitration. (*Id.* at 5). Trilogy has filed a motion to compel arbitration based upon the Agreement and to stay the remainder of the proceedings, including Plaintiff's loss of consortium claim, until the arbitration proceedings are completed. (Doc. No. 7). Plaintiff filed a brief in opposition to Trilogy's motion, (Doc. No. 9), and Trilogy filed a brief in reply. (Doc. No. 10). For the reasons stated below, I deny Trilogy's motion.

## II.　　Discussion

Trilogy argues Plaintiff must be compelled to submit to binding arbitration for all claims arising from allegedly deficient care. (Doc. No. 7). Plaintiff contends the Agreement is not enforceable, and therefore none of her claims are subject to arbitration, because she did not have authority to sign the Agreement on Annette's behalf. (Doc. No. 9). Before I reach the merits of the parties' arguments, I must first determine what law governs Trilogy's motion to compel.

### A.　　Applicable Law

Plaintiff, an Ohio resident, invoked diversity jurisdiction pursuant to 28 U.S.C. § 1332 in filing suit against Trilogy, a Delaware resident. (Doc. No. 1 at 1). In the ordinary case, a federal court sitting in diversity jurisdiction applies the substantive law of the state in which it sits and federal procedural law. *See, e.g., Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). But, in cases involving arbitration agreements, federal courts also must consider what impact a federal law – the Federal Arbitration Act (the "FAA") – has on the proceedings.

2

Section 2 of the FAA provides that agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA articulates a "strong federal policy in favor of arbitration" and dictates that contractual ambiguities or "doubts as to the parties' intentions should be resolved in favor of arbitration." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (citations omitted). In enacting § 2, "Congress precluded States from singling out arbitration provisions for suspect status." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). Thus, the FAA preempts "state laws [which are] applicable *only* to arbitration provisions." *Id.* (emphasis in original).

State law, however, bears upon the question of whether the parties in fact validly entered into an arbitration agreement. A court may apply state law to that question: "[S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) (emphasis in original) (alteration added).

Thus, while I "examine the language of the [parties'] contract in light of the strong federal policy in favor of arbitration," I must apply Ohio law to the question of whether the Agreement constitutes a valid agreement to arbitrate the parties' disputes. *Stout*, 228 F.3d at 714.

### B. MOTION TO COMPEL ARBITRATION

The parties' present disagreement centers on Plaintiff's role in executing the Agreement. There is no dispute that Plaintiff signed the Agreement, not Annette. (*See* Doc. No. 7-1 at 6). But Plaintiff contends she "did not have the legal authority to sign the Arbitration Agreement on behalf of Annette" and, therefore, the Agreement is not enforceable. (Doc. No. 9 at 2). Trilogy argues the Agreement can and must be enforced, asserting Plaintiff "ignores (1) the actual authority Plaintiff had to enter into the Agreement, (2) the representations Plaintiff made in the Arbitration

3

Agreement, and (3) the actions of Plaintiff and decedent following the entry into the Agreement." (Doc. No. 10 at 2).

Under Ohio law, "[t]he relationship of principal and agent, and the resultant liability of the principal for the acts of the agent, may be created by the express grant of authority by the principal. Absent express agency, the relation may be one of implied or apparent agency." *Master Consol. Corp. v. BancOhio Natl. Bank*, 575 N.E.2d 817, 820 (Ohio 1991).

While Trilogy complains Plaintiff did not submit an affidavit in support of her position, (Doc. No. 10 at 1), it is the "party alleging the existence of an agency relationship [which] bears the burden of proving that such a relationship exists." *Nee v. State Indus., Inc.*, 3 N.E.3d 1290, 1308 (Ohio Ct. App. 2013) (citations omitted). *See also Gardner Plumbing, Inc. v. Cottrill*, 338 N.E.2d 757, 759 (Ohio 1975). Thus, it is Trilogy's duty to point to evidence establishing that Plaintiff acted as Annette's agent.

### 1. Express Agency

Trilogy argues Plaintiff had actual authority to enter into the Agreement on Annette's behalf because Plaintiff (1) signed the Agreement as Annette's legal representative and (2) had authority to act on Annette's behalf pursuant to her designation as agent in Annette's durable power of attorney for health care ("HCPOA"). (Doc. No. 10 at 3-4). Neither argument is persuasive.

I begin with Trilogy's first argument. The Agreement contains two signature lines. One line was designated for the "Signature of Facility Representative" and the other was for the "Signature of Resident or Legal Representative." (Doc. No. 7-1 at 6). Trilogy argues the Agreement is binding because Plaintiff held herself out as Annette's legal representative, as though she had actual authority to act on Annette's behalf. (Doc. No. 10 at 3).

But the law holds a principal liable for an agent's actions only if the principal has engaged in conduct which shows the agent has permission to act on the principal's behalf. "'Express authority

4

is that authority which is <u>directly granted to or conferred upon the agent</u> or employee <u>in express terms by the principal</u>, and it extends <u>only to such powers as the principal gives the agent in direct terms</u>; and the express provisions are controlling where the agency is expressly conferred.'" *Master Consol. Corp.*, 575 N.E.2d at 820 (quoting *Stevens v. Frost*, 32 A.2d 164, 168 (Maine 1943)) (emphasis added). Trilogy offers no proof that Annette had communicated to Springview Manor staff members that Plaintiff had authority to enter into the Agreement as her legal representative.

Trilogy, relying on *Vogt v. Indianaspring of Oakley*, 2012-Ohio-4124, 2012 WL 3985953 (Ohio Ct. App. Sept. 12, 2012), also argues that, by signing on the Legal Representative signature line, Plaintiff assumed the burden to demonstrate the Agreement is not valid. (Doc. No. 10 at 3). In *Vogt*, the plaintiff had signed an arbitration agreement on behalf of her mother and subsequently brought negligence and wrongful death claims against the defendant. *Vogt*, 2012 WL 3985953, at *1. The *Vogt* court held "the presumption in favor of arbitrability" put the burden on the plaintiff to prove she did not have the authority to bind the decedent as a legal representative and that, because the plaintiff failed to disprove this point, the arbitration agreement was binding. *Id.* at *2. *See also Alford v. Arbors at Gallipolis*, 123 N.E.3d 305, 315-16 (Ohio Ct. App. 2018).

There is reason to question the shifting burdens employed by the courts in *Vogt* and *Alford*. As an initial matter, those decisions turn on its head the general and well-established principal that "the burden of proving the agency . . . [is] upon the party who asserts it," *Gardner Plumbing, Inc.*, 338 N.E.2d at 759, without even <u>acknowledging</u> the general principal. Other Ohio courts of appeal have rejected this burden shifting. *See, e.g., Loyer v. Signature Healthcare of Galion*, 66 N.E.3d 779, 784 (Ohio Ct. App. 2016) (holding "defendants failed to meet their burden of proving that . . . [decedent's personal representative] had actual authority to bind . . . [decedent] to the terms of the arbitration agreement"); *Scott v. Kindred Transitional Care & Rehab.*, 2016-Ohio-495, 2016 WL 561756, at *2 (Ohio Ct. App. Feb. 11, 2016) (holding defendant failed to establish decedent's daughter had actual

5

authority to enter an arbitration agreement on decedent's behalf); *Brown v. Extendicare, Inc.*, 39 N.E.3d 896, 912 (Ohio Ct. App. 2015) (holding, "contrary to *Vogt*, it was Extendicare's burden to establish" an alleged agent had authority to act on the principal's behalf).

Moreover, *Vogt* and *Alford* are factually distinguishable. In *Vogt*, the arbitration agreement contained the following statement:

> If Resident is unable to sign this Agreement, then a legal representative of the resident may sign on his/her behalf. The person signing below certifies that he/she has the legal authority to enter into this Agreement on Resident's behalf with the Facility either through a valid Power of Attorney or a guardianship appointment.

*Vogt*, 2012 WL 3985953, at *2.

The *Alford* arbitration agreement included similar language: "If signed by a Legal Representative, the representative certifies that the Center may reasonably rely upon the validity and authority of the Representative's signature based upon actual, implied or apparent authority to execute this Agreement as granted by the Resident." *Alford*, 123 N.E.3d at 315.

By contrast, the Agreement in this case contains no such language. Instead, the words "Legal Representative" appear exactly one time – in the signature line. This lone reference is not sufficient to establish Annette had given Plaintiff express agency to enter into the Agreement on her behalf. *McFarren v. Emeritus at Canton*, 997 N.E.2d 1254, 1259-60 (Ohio Ct. App. 2013) (distinguishing *Vogt*). *See also Loyer*, 66 N.E.3d at 784 (holding the fact that an alleged agent signed an arbitration agreement as the principal's "purported 'representative' cannot vest [the alleged agent] with actual authority in the absence of a statutorily valid power of attorney or court order").

Next, Trilogy contends Plaintiff had express authority to enter into the Agreement as Annette's agent through Annette's HCPOA. (Doc. No. 10 at 4-5). But this argument falls short as well.

As Trilogy acknowledges, Annette's HCPOA named Plaintiff as an agent authorized to make decisions pursuant to the terms of the HCPOA. (*See* Doc. No. 10 at 4). Under Ohio law, the

6

agency granted by a health care power of attorney is conditional: "An attorney in fact under a durable power of attorney for health care shall make health care decisions for the principal . . . <u>only if</u> the attending physician of the principal determines that the principal has lost the capacity to make informed health care decisions for the principal." Ohio Rev. Code § 1337.13(A)(1) (emphasis added).

The HCPOA echoes this statutory requirement, stating it is in effect "only when" Annette could not make health care decisions for herself. (Doc. No. 9-1 at 2). The record contains no evidence or suggestion that a physician had determined Annette was unable to make her own health care decisions. *McFarren*, 997 N.E.2d at 1259 ("If the conditions required for the power of attorney to come into being are not fulfilled, the representative has no authority to bind the principal.").

Even if such evidence existed, it would not be sufficient to demonstrate that Plaintiff had express authority to sign the Agreement on Annette's behalf. The HCPOA lists Plaintiff as the first alternate agent, rather than the primary agent. (*Id.* at 4). Trilogy provides no evidence that Plaintiff would have been the appropriate person to act as Annette's agent under the HCPOA.

Lastly, even if I again were to assume such evidence existed, Trilogy still would not be able to show Plaintiff had express authority under the HCPOA to enter into the Agreement on Annette's behalf. The plain language of the HCPOA again mirrors the statutory language, granting an agent "full and complete authority to make all <u>health care</u> decisions" for the principal. (*Id.* at 5) (emphasis added). *See* Ohio Rev. Code § 1337.13(A)(1) ("An attorney in fact under a durable power of attorney for health care shall make <u>health care</u> decisions for the principal . . . .") (emphasis added). A decision involving health care means a decision involving "any medical (including dental, nursing, psychological, and surgical) procedure, treatment, intervention or other measure to maintain, diagnose or treat any physical or mental condition." (Doc. No. 9-1 at 3).

7

Under Ohio law, "a decision to arbitrate a dispute is not a decision on informed consent to care, treatment, service, or procedure to maintain, diagnose, or treat the patient's physical or mental health or condition." *Primmer v. Healthcare Indus. Corp.*, 43 N.E.3d 788, 793 (Ohio Ct. App. 2015). *See also Primmer*, 43 N.E.3d at 795 (holding a durable power of attorney for health care did not convey actual authority to enter into an arbitration agreement because "the decision to waive the right to arbitrate is a legal determination, not a health care decision"). Therefore, even if the HCPOA had been operative, it would not provide Plaintiff with the authority to enter into an arbitration agreement.

I conclude Trilogy fails to show Plaintiff had express authority to enter into the Agreement on Annette's behalf and deny its motion to compel arbitration on that basis.

## 2. Apparent Agency

Trilogy also argues Plaintiff had apparent authority to enter into the Agreement on Annette's behalf. (Doc. No. 10 at 5-6). Trilogy suggests it reasonably believed Plaintiff had the authority to sign the Agreement because (1) Annette allowed Plaintiff to sign as legal representative and (2) Annette listed Plaintiff as an agent on the HCPOA. Neither of these points prove Plaintiff had the apparent authority to enter into the Agreement on Annette's behalf.

A party which seeks to hold a principal liable for an alleged agent's actions through apparent agency "must affirmatively show: (1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of those facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority." *Loyer*, 66 N.E.3d at 784 (citation and internal quotation marks omitted). "The principal is responsible for the agent's acts only when the principal has clothed the agent with apparent authority and not when the agent's own conduct has created the apparent authority." *Ohio State Bar*

8

*Assn. v. Martin,* 886 N.E.2d 827, 834 (Ohio 2008) (citing *Master Consol. Corp.*, 575 N.E.2d at 822).

I conclude Trilogy has failed to meet its burden of showing Annette took specific actions which clothed Plaintiff with apparent authority to enter into the Agreement. I already have rejected Trilogy's arguments based upon the HCPOA with respect to the theory of actual authority, and that reasoning provides no stronger support with respect to the theory of apparent authority. *See Primmer*, 43 N.E.3d at 796 (holding decedent's power of attorney for health care did not cloak decedent's daughter with apparent authority to enter into arbitration agreement because entering into such an agreement "did not constitute a health care decision under the plain language of the instrument and statutory provisions"). Nor do Trilogy's other arguments meet its burden here.

Trilogy argues its employees "had reason to believe that [Plaintiff] had the necessary authority to act on her mother's behalf based on the decision-making authority [Plaintiff] exercised during the admission process." (Doc. No. 10 at 6). But "the mere fact that a family member signed other documents as part of the admission process did not cloak the family member with the requisite apparent authority to bind the person admitted to a facility to an arbitration agreement that he or she knew nothing about." *Scott*, 2016 WL 561756, at *4. *See also Loyer*, 66 N.E.3d at 785 ("As in *Simmons* [*v. Extendicare Health Services, Inc.*, 2016-Ohio-4831, 2016 WL 360854 (Ohio Ct. App. July 5, 2016)], Calvin signed the paperwork for Edeltrud's admission to defendants' facility and the arbitration agreement was not a precondition to Edeltrud's admission."); *Lang v. Beachwood Pointe Care Ctr.*, 2014-Ohio-1238, 2014 WL 1340212, at *2 (Ohio Ct. App. Mar. 27, 2014) (holding a principal could not give her alleged agent "authority to bind her to an arbitration clause that she knew nothing about" when "there is no evidence . . . [an] agreement to arbitrate disputes was a necessary precondition for admission . . . [or that] the arbitration agreement one . . . [a prospective resident] might reasonably expect to be a part of the admission process"). And Trilogy's argument suffers

from the fatal flaw that it relies solely on the actions Plaintiff took, and "a claim of apparent authority cannot be based on the purported agent's acts." *Id.*

Trilogy, relying on *Brown v. Extendicare, Inc.*, 39 N.E.3d 896 (Ohio Ct. App. 2015), argues Annette "clothed [Plaintiff] with the appearance of authority and knowingly permitted her to act as agent on her behalf." (Doc. No. 10 at 6). At least two Ohio courts of appeal have concluded that the unusual facts presented in *Brown* make that case "'fundamentally distinguishable,'" and I conclude the same is true here. *Simmons*, 2016 WL 360854, at *5 (quoting *Scott*, 2016 WL 561756, at *5).

> As the *Scott* court noted, in *Brown*,
>
> there were two separate admissions of the resident. In the first admission, the resident's daughter signed an admission agreement as the resident's legal representative for healthcare and financial decisions. In the second admission, *the resident herself* signed the admission agreement, which also contained a designation of her daughter as her legal representative for healthcare and financial decisions. Based on these circumstances, the Second District held that the resident herself clothed her daughter with the appearance of authority and knowingly permitted her daughter to act as agent on her behalf.

*Scott*, 2016 WL 561756, at *5. *See also Simmons*, 2016 WL 3608654, at *5-6.

In this case, as in *Scott* and *Simmons*, there is no evidence in the record that Annette signed any document designating Plaintiff as her representative, or otherwise took any affirmative act which could reasonably cause Trilogy's staff members to believe that Plaintiff had the authority to enter into the Agreement on Annette's behalf. Therefore, I conclude Trilogy has failed to carry its burden of proof and deny its motion to compel on this basis as well.

### III. CONCLUSION

For the reasons stated above, I deny Trilogy's motion to compel arbitration and to stay these proceedings. (Doc. No. 7).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge
